AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

Eastern District of Pennsylvania

United States of America
v.
Nicholas Hovan, Zhenyu Wang (a/k/a "Bill Wang"), Robert Thwaites, Nicholas James Fuchs, and Daniel Ray Lane

*Defendant(s)*

Case No. 20-191-M
[UNDER SEAL]

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of July 2019 to February 2020 in the county of Philadelphia in the Eastern District of Pennsylvania, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 371 | conspiracy |
| 50 U.S.C. §§ 1701–1707 | engaging and attempting to engage in transactions prohibited by the International Emergency Economic Powers Act ("IEEPA") |

This criminal complaint is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

[signature]
*Complainant's signature*

Andrew T. Torno, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 02/07/2020

[signature]
*Judge's signature*

City and state: Philadelphia, Pennsylvania

Hon. Marilyn Heffley, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT

I, Andrew T. Torno, being first duly sworn, hereby depose and state as follows:

## Background of Affiant

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed with the FBI for approximately two years. I am authorized to investigate violations of federal law and to execute arrests and search and seizure warrants. I am currently assigned to the FBI White Collar Crimes Branch in Philadelphia, Pennsylvania, which investigates crimes involving law enforcement corruption, fraud against the government, violations of the Foreign Corrupt Practices Act, international human rights violations, and complex financial crimes. I have received training in various aspects of law enforcement, including investigating violations of U.S. law and regulations. I have conducted or participated in numerous criminal investigations. Before my employment with the FBI, I was a Municipal Police Officer in St. Louis, Missouri, from December 2010 until my employment with the FBI. As a Police Officer I investigated various local and state violations.

2. I am currently an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7) and am empowered by law to conduct investigations and to make arrests.

## Purpose of the Affidavit

3. As explained in detail below, I have probable cause to believe that NICHOLAS HOVAN ("HOVAN"), ZHENYU WANG, a/k/a Bill Wang ("WANG"), ROBERT THWAITES ("THWAITES"), NICHOLAS JAMES FUCHS ("FUCHS"), and DANIEL RAY LANE ("LANE") committed, within the Eastern District of Pennsylvania and elsewhere, violations of 18 U.S.C. § 371 and 50 U.S.C. §§ 1701–1707, 31 C.F.R. §§ 560.203, 560.204, and

560.206, Executive Orders 12,957, 12,959, and 13,059, 84 Fed. Reg. 9,219, and 18 U.S.C. § 2. Evidence described below has shown that HOVAN, WANG, THWAITES, FUCHS, LANE, and others conspired to evade U.S. economic sanctions against the Islamic Republic of Iran by attempting to facilitate the purchase of petroleum directly from Iran, to mask the origins of the petroleum due to sanctions, and to sell the petroleum to China under masked origins. HOVAN, WANG, THWAITES, FUCHS, and others entered into a contract with a Chinese company to sell said petroleum, in violation of the International Emergency Economic Powers Act ("IEEPA") and other provisions of federal law, and for the purpose of making substantial illicit profits.

4. I submit this Affidavit in support of a criminal complaint and arrest warrants for HOVAN, WANG, THWAITES, FUCHS, and LANE for: (a) conspiracy to violate IEEPA, in violation of 18 U.S.C. § 371; and (b) engaging and attempting to engage in transactions relating to or dealing in goods, technology, and services for sale by a company located in Iran, in violation of 50 U.S.C. §§ 1701–1707, 31 C.F.R. §§ 560.203, 560.204, and 560.206, Executive Orders 12,957, 12,959, and 13,059, 84 Fed. Reg. 9,219, and 18 U.S.C. § 2.

5. For the reasons set forth herein, there is probable cause to believe that from in or about July 2019 through in or about February 2020, HOVAN, WANG, THWAITES, FUCHS, and LANE, each of whom is an United States person, in the Eastern District of Pennsylvania and elsewhere:

a. conspired and agreed with each other and with others known and unknown to Your Affiant, to knowingly and willfully violate IEEPA and the regulations promulgated thereunder, in violation of 18 U.S.C. § 371; and
b. willfully and knowingly violated IEEPA, and the regulations promulgated thereunder, that is, without obtaining the required approval by the Department of the Treasury, Office of Foreign Assets Control ("OFAC"),

engaging and attempting to engage in transactions relating to or dealing in goods, technology, and services for sale by a company located in Iran, in violation of 50 U.S.C. §§ 1701–1707, 31 C.F.R. §§ 560.203, 560.204, and 560.206, Executive Orders 12,957, 12,959, and 13,059, 84 Fed. Reg. 9,219, and 18 U.S.C. § 2.

6. The information contained in this Affidavit is based upon, among other things: my personal observations, my training and experience, documents I have reviewed, audio recordings of telephone calls and meetings, and information obtained from other agents, law enforcement entities, and witnesses.

7. This Affidavit is being executed as part of an ongoing investigation and is based on my current understanding of the relevant facts based on the above. As the investigation proceeds, new facts may come to light that qualify or contradict prior facts. Because this Affidavit is being submitted for the limited purpose of establishing probable cause for the criminal complaint and arrest warrant, Your Affiant has not included each and every fact known concerning this investigation. Rather, the facts set forth herein constitute a summary of the investigation and known facts. Further, Your Affiant has only set forth the facts that Your Affiant believes are necessary to establish that there is probable cause to believe that HOVAN, WANG, THWAITES, FUCHS, and LANE have violated: (a) 18 U.S.C. § 371; and (b) 50 U.S.C. §§ 1701–1707, 31 C.F.R. §§ 560.203, 560.204, and 560.206, Executive Orders 12,957, 12,959, and 13,059, 84 Fed. Reg. 9,219, and 18 U.S.C. § 2.

**Applicable Laws**

8. Title 18, United States Code, Section 371 makes it unlawful for "two or more persons [to] conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and [for] one or more of such persons do any act to effect the object of the conspiracy."

9. Through IEEPA, 50 U.S.C. §§ 1701–1707, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). Pursuant to that authority, the President and the executive branch have issued orders and regulations governing and prohibiting certain activities and transactions with Iran by U.S. persons or involving items of U.S. origin or exported from the United States.

10. Pursuant to IEEPA, Title 50, United States Code, Section 1705(a), "[i]t shall be unlawful for a person to violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter," and pursuant to Section 1705(c), "[a] person who willfully commits, willfully attempts to commit, or willfully conspires to commit, or aids or abets in the commission of, an unlawful act described in subsection (a) of this section shall" be guilty of a crime.

11. In 1995 and again in 1997, the President issued a series of three Executive Orders regulating transactions with Iran pursuant to his authorities under IEEPA. See Executive Orders 13059 (Aug. 19, 1997), 12959 (May 6, 1995), and 12957 (Mar. 15, 1995). Since 1997, the President has continued the national emergency with respect to Iran and Executive Orders 13059, 12959, and 12957. The most recent continuation of this national emergency was on March 12, 2019. See 84 Fed. Reg. 9,219 (Mar. 13, 2019).

12. To implement Executive Order 13059, which consolidated and clarified the earlier two Executive Orders, the U.S. Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued the Iranian Transactions and Sanctions Regulations ("ITSR") (31 C.F.R. Part 560). Absent permission from OFAC in the form of a license, these regulations prohibited, among other things:

a. the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, transshipment, or reexportation, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.204);

b. U.S. persons, wherever located, engaging in any transaction or dealing in or related to (1) goods or services of Iranian origin or owned or controlled by the Government of Iran; or (2) goods, technology, or services for exportation, sale, supply, directly or indirectly, to Iran or the Government of Iran (31 C.F.R. § 560.206); and

c. any transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in the ITSR (31 C.F.R. § 560.203).

**Summary of the Investigation**

13. According to a person who later became a confidential human source ("CHS") and audio recordings on or about June 28, 2019, CHS met Person #1 (whose identity is known to Your Affiant) in Victoria, London.[1] Person #1 referred CHS to HOVAN and another individual (Person #2, whose identity is known to Your Affiant) to assist in brokering a sanctioned Iranian oil deal in the United States with U.S. citizens.

14. According to the CHS and audio recordings of a July 17, 2019, call between HOVAN and the CHS, HOVAN and the CHS discussed the purported sale of sanctioned Iranian petroleum products. HOVAN said he was in conversation with Dallas,

[1] The government reimbursed the CHS for expenses that he incurred in connection with his activities, including as described in this Affidavit. This includes travel expenses, lodging, and a payment for meals and incidentals. In addition, there were discussions between the CHS and the government regarding possible whistleblower payments to the CHS.

Texas–based contacts who were looking for 6 million barrels of oil per month. During the call, Hovan mentioned one of his customers was called Royal Palm. According to open source databases, the company Royal Palm is associated with Thwaites. HOVAN also said during the call, "Right now the delivery port is Shanghai free trade zone." He also stated, "More product I can sell it. The more we sell the more we make." And, during the call, HOVAN told CHS, "Hopefully we can fulfill the volume needs and more."

15. According to the CHS, audio recordings, and FBI surveillance on July 31, 2019, CHS had a meeting with HOVAN and Person #2 in Philadelphia, Pennsylvania. HOVAN said he had been trying to put together oil deals for years and always had buyers but never a supplier of oil. HOVAN and Person #2 claimed to represent major oil buyers in the United States, Panama, and the People's Republic of China. HOVAN further claimed to know the Chinese Minister of Energy's son and stated that could move 6 million barrels of oil monthly through this connection alone. HOVAN stated that he had other investors, identified as "Nick" (later identified as FUCHS), "Rob" (later identified as THWAITES), and Rob's partner from China (later identified as WANG). During the meeting, HOVAN excused himself to make a phone call. When he returned from the call, HOVAN reported his "investors" had no problem with Iranian oil quoting "Iran? Whatever, who cares" and "I don't give a fuck." HOVAN said not to converse over telephone or email due to the illegal nature of the proposed transaction, later stating, "Got to be diligent on these things."

16. According to an undercover agent ("UC"), the CHS, and audio recordings, on September 18, 2019, CHS, UC, and FUCHS met at the W Dallas–Victory Hotel, 2440 Victory Park Lane, Dallas, Texas. FUCHS explained how all the parties got involved in the deal. FUCHS said HOVAN brought the deal to him. Next, FUCHS brought in his co-worker

(THWAITES) because of THWAITES's connections to China through WANG. This formed the first potential buyer. Separately, FUCHS brought in his boss, LANE, who is the owner of STACK.[2] The UC explained his/her role as a reputational manager for finance, that is, to arrange financing and movement of money for the deal. Fuchs was told by the UC about American sanctions against Iran. The UC told Fuchs that the suppliers would want to "get American dollars here, now obviously not in their name, shell corporations…" to get the best deal. He explained, "some logistic costs have to go to Central Bank. So you know, you still have to pay the guy to connect the hose…" FUCHS added that LANE had mercenaries willing to protect the shipment of Iranian oil for approximately $100,000. FUCHS, UC, and CHS collectively joked about the need to be careful since none wanted to end up in jail.

17. According to the UC, CHS, and audio recordings, on September 19, 2019, UC, CHS, WANG, and THWAITES met at the W Dallas–Victory Hotel, 2440 Victory Park Lane, Dallas, Texas. THWAITES said he worked with FUCHS and LANE. WANG explained he is the U.S. representative for a Chinese refinery. WANG provided a redacted document WANG purportedly received from his boss that "was designed for the discounted crude oil" but falsely reflected origins in places such as Armenia, Iraq, and Oman, as opposed to Iran. WANG said "they" (from context, it appears that WANG was speaking of his company) have already purchased 2 million barrels from the "same origin." WANG said the risk was manageable. CHS inquired if the purchaser will know that the fuel is Iranian to which both THWAITES and WANG responded yes. UC stated that prior to refinement, the true origin of the oil is detectable. THWAITES and WANG added that even prior to refinement, if the source oil was blended with oil from other places, the risk is gone. For management commissions, THWAITES

[2] STACK Royalties is referred to herein as "STACK"

recommended a model where twenty-five percent of the profit went to the managers and seventy-five percent went to the investors. WANG confirmed his Chinese refinery will not perform any due diligence, even though a typical deal would require two years of financial records. The UC explained that, to conceal the true origin of the oil, a Polish shell corporation could be used as a straw seller of the illicit oil, which understanding WANG confirmed.

18. According to the UC, CHS, and audio recordings, on September 19, 2019, UC, CHS, FUCHS, and LANE met at STACK's offices, located at 15770 Dallas Parkway, Suite 1000, Dallas, Texas. LANE confirmed that he was aware of the sanction restriction but stated that he did not have a problem with sanctions by adding "sanctions can always be massaged . . . you know, there is always a way around it." When discussing the financing of a separate deal, LANE inquired if "they ever need to wash it further" to include "assets that actually generate them income." LANE further suggested using mineral rights because the value of the asset is whatever LANE claims it to be in an affidavit.

19. According to the UC and audio recordings of an October 22, 2019, call between UC and WANG, the UC inquired if the buyers will do any due diligence on the Polish entity because it is just a shell entity. WANG said because of his recommendation, the Chinese authorities will accept the shell without due diligence. WANG discussed getting a purchase order from China and requested a copy of the specifications sheet for the oil. WANG asked if the UC could commit to a yearlong agreement. WANG confirmed his buyers do not care where the Polish entity claims the oil is coming from as long as it does not list a sanctioned country.

20. According to the UC and audio recordings of a November 12, 2019, call between the UC and THWAITES, THWAITES agreed with the plan to use simplified purchase

orders that are non-binding due to the illegal nature of the deal. WANG had represented that his refinery views such documentation as a guarantee and binding upon the parties.

21. According to the UC and audio recordings of a November 14, 2019, call between the UC and THWAITES, THWAITES said he had spoken to WANG. THWAITES explained the refinery did not want to appear to have sought out the deal so it can maintain "plausible deniability." Instead, it would prefer to make it appear like the Polish entity reached out to them. WANG sent a document to China that was meant to be that initial overture from the Polish shell company. After that, the refinery would respond with either a purchase order or a letter of intent.

22. According to the UC and audio recordings of a November 20, 2019, call between the UC and THWAITES, THWAITES explained that WANG's refinery was seeking a "performance bond" to protect it if the deal fell though. UC said the refinery cannot get a pass from the risk that comes with the source country. If something bad happens, like "the U.S. Navy takes that vessel," everyone walks away from the deal and no one gets paid. THWAITES confirmed that if something bad like that happens, everyone is running away from the deal "quickly." THWAITES wanted to figure out the right terms for the bond in case "something catastrophic like a seizure happens." THWAITES reminded the UC that "with satellites these days, they are watching." THWAITES said that the ship can turn the trackers off so they cannot track it.

23. According to the UC and audio recordings of a November 25, 2019, call between the UC, CHS, HOVAN, and Person #2, UC advised he had a potential lead for financing based in Philadelphia. HOVAN agreed to represent the management company at the meeting with the potential financier.

24. According to the UC, audio recordings, and FBI surveillance on January 8, 2020, the UC, HOVAN, Person #2, and two other undercover agents, posing as an investor and account manager, respectively, met in a room at Hotel Monaco, 433 Chestnut Street, Philadelphia, Pennsylvania. At the meeting, HOVAN and Person # 2 pitched the details of the oil deal to the undercover agent posing as an investor, including the oil's Iranian origin and the Chinese buyers, with the intention of convincing the undercover agent–investor to provide $10 million to finance the deal.

25. According to the UC and audio recordings of a January 9, 2020, call between the UC, FUCHS, and LANE, LANE explained how he could assist in laundering money from this oil deal through LANE's company, STACK. The UC told LANE the initial shipment would generate around $30 million.

26. According to the UC and audio recordings of a January 13, 2020, call between the UC and LANE, LANE went into more detail as to how mineral rights could be used to launder money. LANE said if the funds were cash "it's a lot easier." LANE said he would put together a diversified portfolio and a proposal that will allow the shell company to purchase assets after the transfer expected to take place February 7, 2020.

27. According to the UC and audio recordings of a January 13, 2020, call between UC, FUCHS, and THWAITES, THWAITES had questions about bank accounts and asked if the UC could help with that. Different offshore accounts were discussed. FUCHS and THWAITES decided to apply for Antigua passports using the UC's contact to set up offshore accounts. THWAITES intended to use an Antigua passport so he could open a Swiss bank account that would not be reported to U.S. authorities.

28. According to the UC and audio recordings of a January 15, 2020, call between the UC and Person # 2, Person #2 notified the UC he was not comfortable with the deal and no longer wished to participate. Person #2 stated, "Maybe I am too vanilla."

29. According to the UC and audio recordings of a January 15, 2020, call between the UC and THWAITES, THWAITES explained how he would launder his commissions. THWAITES added WANG to the call. WANG advised the Chinese received the signed draft contract he had sent. WANG said he will be working on a "fee protection agreement" that will cover "inspection, politician, buyer, everything." WANG explained the additional $4 per barrel is for "a politician, the banks, the inspection, and the person signing the contract." WANG said it was for such persons "to say this is not Iranian." The UC expressed concern about the appearance of these payments and explained a politician receiving money "looks like a straight fucking bribe." WANG laughed and said, "It is a bribe . . . it is . . . I don't want to sugar coat it . . . it is a bribe."

30. According to the UC and audio recordings of a January 17, 2020, call between the UC and LANE, during which they discussed a $5 million mineral rights purchase, LANE said, "We could put $1 million on the books," spread over diverse properties, "so you aren't getting hit with any huge tax bills," and the properties are "producing tremendously compared to what was put on the books." In reference to the remaining $4 million in cash, UC asked if LANE would be "booking that," and LANE said, "I would not, no."

31. According to the UC and audio recordings of a January 23, 2020, call between UC, CHS, and HOVAN, the CHS explained everything was in place for an initial shipment and thereafter two shipments per month on the fifteenth and the thirtieth days of each month. HOVAN confirmed he knew about the extra $4 per barrel bribe payment. HOVAN

confirmed he will receive 2.5% of the profits from the deal and explained how he would get his share of the commissions laundered.

32. On or about January 23, 2020, an FBI-controlled post office box received an envelope believed to be from WANG containing documents, including but not limited to an application for an Antigua Passport, passport photographs, and a $300.00 cashier's check. Based on recorded conversations, WANG expressed that he was sending this to be used to set up an off shore bank account to receive commissions from the deal.

33. On or about January 24, 2020, an FBI-controlled post office box received an envelope believed to be from THWAITES containing documents, including but not limited to an application for an Antigua Passport, passport photographs, and a $300.00 cashier's check. Based on recorded conversations, THWAITES expressed that he was sending this to be used to set up an off shore bank account to receive commissions from the deal.

**CONCLUSION AND REQUEST FOR SEALING**

34. Based on the foregoing, there is probable cause to believe that HOVAN, WANG, THWAITES, FUCHS, and LANE committed: (a) conspiracy, in violation of 18 U.S.C. § 371; and (b) violations of IEEPA and the regulations promulgated pursuant to thereto, in violation of 50 U.S.C. §§ 1701–1707, 31 C.F.R. §§ 560.203, 560.204, and 560.206, Executive Orders 12,957, 12,959, and 13,059, 84 Fed. Reg. 9,219, and 18 U.S.C. § 2.

35. Because this is an application that pertains to an ongoing criminal investigation and because disclosure of the information herein as well as disclosure of the warrant being requested herein may compromise the investigation by informing the targets of the investigation of the nature and techniques of the investigation, and affording the targets of the investigation opportunities to flee or to destroy or to tamper with evidence or witnesses, Your

Affiant requests that the arrest warrants, criminal complaint, and this affidavit, and all related papers, be sealed by the Court, and be unsealed upon further order of the Court

Andrew T. Torno, Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
this 7th day of February 2020.

HONORABLE MARILYN HEFFLEY
UNITED STATES MAGISTRATE JUDGE